HOWARD SAMUELSON, Plaintiff-Appellant, v. KIMBALL WYMAN, Defendant-Appellee and Third-Party Plaintiff and Cross-Appellee (The City of Chicago, Third-Party Defendant and Cross-Appellant).

First District (2nd Division)   No. 1—90—0466

Opinion filed November 19, 1991.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal and Brian Trubitt, Assistant Corporation Counsel, of counsel), for appellant City of Chicago.

Patrick E. Dwyer & Associates, Ltd., of Chicago, for appellant Howard Samuelson.

Robert L. Bartolone and Sandra Young, both of Purcell & Wardrope, Chartered, of Chicago, for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff Howard Samuelson appeals from the circuit court's judgment, following a jury verdict, which failed to award him any damages for the value of past and future earnings lost as the result of the negligence of defendant Kimball Wyman. Samuelson claims that the jury's verdict on that issue was against the manifest weight of the evidence and seeks a reversal of the judgment and a remand for a new trial on the issue. The City of Chicago (City) cross-appeals from that part of the same judgment entered on the jury's verdict that the City was liable for contribution to Wyman for part of the judgment against him. The City contends that section 2—109 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1987, ch. 85, par. 2—109) immunized it from liability for its negligence in training and equipping Samuelson, a City employee, and that even if the Tort Immunity Act did not apply, its negligence was not a proximate cause of Samuelson's injuries. The City seeks reversal of the judgment, or reversal with a remand for a new trial.

Samuelson's second amended complaint charged that on February 21, 1979, Wyman negligently drove his automobile so as to collide with another car, and that the impact of the accident caused one of the cars to run into and injure Samuelson. Wyman's case against the City was based on the City's alleged negligence in failing "to provide safety training to Samuelson in the use of safety equipment" and in failing to provide him with a "Mars" light (a rotating orange light which is placed on top of a car), and that such failures entitled Wyman to contribution from the City.

Samuelson testified that at the time of the accident he was a traffic signal repairman for the bureau of electricity of the City's Department of Streets and Sanitation, and "was in excellent health." On the evening of February 21, 1979, he responded to a call to repair an "all out" at the intersection of 43rd Street and Cicero Avenue, in Chicago. When he arrived there in his car, he observed that the signals on 43rd (an east-west street) were functioning normally, and that the yellow

and green signals on Cicero (a north-south street) were also in proper working order; however, the "north and south red [on Cicero] would flick on momentarily and then go out entirely." The intersection was lighted by streetlights and by the lights from a filling station on the corner.

Samuelson kept the tools he needed to control and repair the traffic signals in the trunk of his car. After parking the car at the southwest corner of the intersection, under a streetlight, he exited the car, walked to the back and opened the trunk. As he attempted to retrieve a unit which would "interrupt the signal circuit and provide a flashing action for [the] *** red lights," he "heard a crash[,] *** looked and *** saw a glint of chrome just a split second before [he was] *** impaled against [his] *** bumper."

At the time of the injury, Samuelson was receiving a wage of "around $12 an hour." He had not, at the time of trial, "ever returned to work at the City." On cross-examination, Samuelson stated that during his recuperation, the City sent him to "Dr. MacNabola," who "sent [him] back to work after two years." In addition, he noted that his "hands were in perfect condition the day of the accident. And three weeks after I noticed my fingers were starting to curl and that's the way they have done to now."

Kimball Wyman testified that as he approached the intersection of 43rd and Cicero, he did not see any traffic signals; that he entered the intersection without slowing down or using his horn, and that he collided with another car, the force of the impact causing his car to slam into Samuelson's car.

Dale Vachout, a surgeon who treated Samuelson during the months following the accident, testified that Samuelson's legs had sustained

> "a crush injury *** below the knees, with on the right side a convoluted [sic], that means frature [sic] with multiple pieces, of the tibia, that's the large bone, and of the upper end of the fibula, that's the small bone. And also there was an open fracture. There was a small wound on the upper part of the leg. *** The left side, he had a fracture in the shaft of the tibia *** approximately eight or ten inches down below the knee with multiple fragments of fracture lines going up towards the knee and also a fracture of the upper end of the small bone or fibula."

Samuelson, he stated, had not yet returned to work by the time he was examined on January 10, 1980, and in his opinion, could not yet "return to his regular work" by October 16, 1980, the date on which

another examination took place. Vachout also felt that by the time of his November 14, 1985, examination, Samuelson was not employable in any capacity other than "some sort of light non-arduous or sedentary type of employment." This inability to work, he believed, was a result of "the multiple injuries he sustained [in the accident], added to this was a combination of *** rheumatoid arthritis in the hands." He wrote in his report that Samuelson had informed him that the arthritis "was present before the accident to a minimal degree, however, since the accident, has progressed to the point at the present time where he is able to do only a minimal amount of activity as far as the hands are concerned and is also restricted as to his ambulating activity." Samuelson later stipulated that the rheumatoid arthritis in his hands did not result from the accident; aggravation of the arthritic condition, however, was an issue at trial. Vachout believed that the condition of Samuelson's legs could worsen.

Robert Eilers, a physician who first examined Samuelson on June 5, 1984, was called in his behalf and on cross-examination was asked the following question and gave the following answer:

"Q. How fast does it take to go from absolutely no symptoms of rheumatoid arthritis to knarled hands?

A. Well, the process is going to take several years to progress to start altering the MCP joints and cause the physical deformity."

Dr. Eilers also testified that Samuelson could do only sedentary work.

Charles Mercier testified that he was an orthopedic surgeon who examined Samuelson in behalf of the defense in January 1984 and that at the time, the rheumatoid arthritis in Samuelson's hands had caused only "mild deformities." When asked on direct examination "whether he was capable of being employed," Dr. Mercier answered that he found Samuelson unable to "do any type of heavy work, *** heavy manual labor, on his feet for a long time, climbing, crawling, any of that type of thing. At the same time, because of his rheumatoid arthritis, again, which I don't think is related to this accident, I think that he cannot do precision work. But, as I say, I think he is far from being disabled."

There was evidence introduced at trial concerning the City's policies and practices regarding the safety training of traffic signal repairmen and whether repairmen were equipped with Mars lights, but in view of the disposition we make of this case, we need not consider it.

The jury awarded Samuelson damages of $575,000, apportioning the award among several items: disability, disfigurement, and pain

and suffering, as well as for medical care, treatment and services. No damages, however, were awarded for "[t]he value of earnings lost and the present cash value of earnings reasonably certain to be lost in the future." On Wyman's third-party claim against the City, the jury found the City liable for 40% of the total award of damages.

Judgment was entered on the verdict on August 12, 1987. In orders filed on September 8 and 11, 1987, the trial court extended the deadline for Wyman, the City and Samuelson to file their post-trial motions to November 10, 1987. On November 10, 1987, the court extended the deadline for Samuelson and Wyman to file the motions to December 1, 1987. On December 1, 1987, the trial court extended the deadline for Wyman and Samuelson to December 30, 1987. On December 8, 1987, the court extended the deadline for the City, Samuelson and Wyman to January 21, 1988, and the City met that deadline.

Samuelson claims that the jury's failure to award him any damages for loss of earnings was against the manifest weight of the evidence. Wyman responds that the verdict was amply supported by evidence that Samuelson's inability to work resulted not from the accident, but from rheumatoid arthritis which predated the accident, was not aggravated by it, and which made him unable to use his hands.

■■ "[A] reviewing court may order a new trial if the damages are manifestly inadequate or if it is clear that proved elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff." (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407.) In *Hollis*, the court held that:

> "the uncontroverted evidence was that the plaintiff was unemployed for 18 months following his accident and that *** he incurred a total wage loss of $24,000 *** not includ[ing] the earnings lost in the period he reentered the work force *** at sharply reduced wages. Only *** $6,000 of the $30,000 award was available to compensate the plaintiff for these lost wages [for the period when he reentered the work force], and as well the permanent disability and disfigurement caused by the injuries, the pain and suffering experienced, and the loss of future earnings attributable to the permanency of the injuries. *** [T]he damages awarded were inadequate." 108 Ill. 2d at 407-08.

In the instant case, the evidence is uncontroverted that Samuelson, until the time of the accident, had been working steadily and earning about $12 an hour and that rheumatoid arthritis did not begin

to affect his hands until three weeks after the accident; there is no evidence, however, that the arthritis affected his ability to earn a living at that time. In fact, Doctor Vachout's unrebutted testimony indicated that the injuries he sustained in the accident prevented Samuelson from working for more than two years after it occurred. The evidence is also unrebutted, in fact, brought out by Wyman's counsel, that Dr. MacNabola, a doctor to whom the City had sent him to be examined, did not find Samuelson fit to send "back to work" until "after two years."

■ Although Doctor Mercier, the defense's expert, testified that by January 1984 the rheumatoid arthritis in Samuelson's hands had caused "mild deformities" which kept him from "do[ing] precision work," he also stated, as noted above, that Samuelson was "far from being disabled," and that the rheumatoid arthritis would have taken "several years to progress *** to cause the physical deformity." The uncontested evidence, then, is that at an absolute minimum, Samuelson was unable to work as a result of the injuries he sustained in the accident for somewhat over two years thereafter. Accordingly, we hold that the jury's failure to award damages for "[t]he value of earnings lost" as a result of the accident was against the manifest weight of the evidence, and we reverse the trial court's judgment upholding that part of the verdict and remand this cause for a new trial on that issue.

In its cross-appeal, the City makes two claims: (1) that any failure to properly train and equip Samuelson involved a policy decision by its employees which would, pursuant to section 2—201 of the Tort Immunity Act (Ill. Rev. Stat. 1987, ch. 85, par. 2—201), have immunized it from liability, and thus, under section 2—109 of the Act, have insulated it from liability for Samuelson's injuries; and (2) that its negligence in training and equipping Samuelson did not proximately cause his injuries. Wyman responds, however, that because the City failed to file its post-trial motion by November 10, 1987, and was not granted an extension by that date, it has waived its right to have these issues reviewed on appeal.

■ According to section 2—1202(c) of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—1202(c)):

> "Post-trial motions must be filed within 30 days after the entry of judgment *** or within any further time the court may allow within the 30 days or any extensions thereof."

"It is essential, in jury cases, to file a post-trial motion in order to preserve an issue for review." (*American National Bank & Trust Co. v. J & G Restaurant, Inc.* (1981), 94 Ill. App. 3d 318, 319.) All three

parties received timely extensions to file their post-trial motions by November 10, 1987; the City, however, neither met that deadline nor sought an extension thereof on or before that date; in fact, it did not do so until December 8, 1987.

In *Putz v. Schulte* (1982), 104 Ill. App. 3d 128, the plaintiff filed his post-trial motion 29 days after the entry of judgment. While his motion was pending, and 43 days after the judgment was entered, the defendants filed their post-trial motion, although they had not received an extension of the 30-day deadline. The trial court denied the plaintiff's motion, but granted the defendants'. The decision was reversed on the ground that "the trial court had lost jurisdiction to consider defendants' late-filed post-trial motion." 104 Ill. App. 3d at 129.

■ The City, however, relying on *Welch v. Ro-Mark, Inc.* (1979), 79 Ill. App. 3d 652, argues that by extending Samuelson's and Wyman's deadlines for filing their post-trial motions, the court retained "jurisdiction over the case when the extension of time [for the City] was granted." We disagree. The court in *Welch* held:

> "If a post-trial motion is filed by one or both of the parties within 30 days of the judgment, the trial court retains jurisdiction over the matter until the disposition of any pending post-trial motion [citation] to act on those points specifically raised in the post-trial motion. Moreover, the trial court also has the jurisdiction, under this circumstance, to act on any error which the court perceives must be remedied in order to do justice between the parties." (79 Ill. App. 3d at 657.)

The holding in *Welch* affords the City no assistance, as it does not recognize a trial court's power to extend, after the deadline set in a prior extension has passed, the time by which a party must file its post-trial motion; nor can it be read to allow a court to consider an untimely filed motion merely because other post-trial motions are pending. We hold that the trial court erred in granting the City an extension in its December 8, 1987, order, and that, accordingly, because the City failed to file a timely post-trial motion, it has waived review of the issues it presents to this court.

For the foregoing reasons, the judgment of the trial court against Wyman is affirmed in part, reversed in part and remanded; its judgment against the City is affirmed.

Affirmed in part; reversed in part and remanded.

HARTMAN and DiVITO, JJ., concur.